

# In the Court of Criminal Appeals of Texas

No. PD-0677-22

LARRY JEAN HART,

*Appellant*

v.

THE STATE OF TEXAS

On Appellant's Petition for Discretionary Review
From the Fifth Court of Appeals
Dallas County

YEARY, J., filed a dissenting opinion in which KELLER, P.J., and KEEL, J., joined.

The Court's opinion abandons our usual posture of deference to a trial court's broad discretion in admitting or excluding evidence. Clearly the Court disagrees with the trial court's decision. But the Court's

opinion fails to demonstrate that the trial court's decision was outside "the zone of reasonable disagreement." *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). That is because it can't—because the trial court's decision wasn't outside that zone.

In *Montgomery*, the Court explained that, when reviewing a trial court's decision to admit or exclude evidence under Rule 403 of the Texas Rules of Evidence, an "appellate court should not conduct a *de novo* review of the record with a view to making a wholly independent judgment whether the probative value of evidence . . . is substantially outweighed by the danger of unfair prejudice." *Id.* at 392. Instead, Appellate courts "should reverse the judgment of the trial court 'rarely and only after a clear abuse of discretion.'" *Id.* (quoting *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986)). But the Court dispenses with both of those admonishments today. Although it pays lip-service to the abuse of discretion standard, in effect, the Court performs a *de novo* review of the trial court record and concludes that, because it would not have admitted the evidence at issue, the trial court abused its discretion to do otherwise—and it was error for the court of appeals to affirm the trial court's decision.

I am convinced the court of appeals correctly upheld the trial court's decision to admit Appellant's rap videos and Facebook posts over Appellant's Rule 403 objection. At the very least, the trial court's decision fell well within the "zone of reasonable disagreement."[1] *Id.* at

---

[1] The Court concludes that the trial court's admission of the rap videos alone warrants reversal of the court of appeals' judgment in affirming that decision. However, under the *Montgomery* factors, I would hold that admission

391. Both the State's decision to offer the evidence and the trial court's decision to admit it were fair responses to Appellant's decision to introduce a fact question about whether he was too naïve to have formulated the mental state required to commit the offense alleged. I would therefore affirm the judgment of the court of appeals.

## I. THE *MONTGOMERY* FACTORS

As the Court's opinion notes, in *Montgomery*, we articulated factors that a trial court should consider in deciding whether the probative value of a piece of evidence is "substantially outweighed by a danger of . . . unfair prejudice[.]" TEX. R. EVID. 403; *Montgomery*, 810 S.W.2d at 389–91. Those factors include: (1) the "inherent probativeness" of the evidence, (2) the evidence's "potential . . . to impress the jury in some irrational but nevertheless indelible way[,]" (3) the time required by the proponent to develop the evidence, and (4) the proponent's need for the evidence. *Id.* Let us focus here, then, on those factors identified by the Court in *Montgomery*.

### A. Inherent Probative Value

The "inherent probative force" of an item of evidence refers to "how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation[.]" *Gigliobianco v. State*, 210 S.W.3d 637, 641 (Tex. Crim. App. 2006). Addressing this factor, the court of appeals observed that the "primary disputed issue at trial" was Appellant's intent to participate in a capital murder. *Hart v. State*, No. 05-19-01394-CR, 2022 WL 3754537 at *8 (Tex. App.—Dallas Aug. 30,

---

of *both* the rap videos *and* Appellant's Facebook posts fell well within the zone of reasonable disagreement.

2022) (mem. op., not designated for publication). In light of his claimed naïveté and lack of language comprehension skills, the issue crystalized into whether those conditions prevented him from forming the required mental state, or *mens rea. Id.*

Citing the State's appellate brief, the court of appeals noted that the rap evidence, and the rap videos particularly, demonstrated Appellant's "ability to easily communicate with words" and his "familiarity with criminal subject matter." *Id.* Similarly, in contrast to his claims that he did not own or have a gun and that he saw no one with guns on the night of the murder, Appellant's Facebook posts suggested a familiarity with guns, an understanding of illicit uses of them, and an awareness of the need to hide them and to not "get kaught."[2] The court of appeals correctly decided that the "trial court

---

[2] In addition to the two rap videos, which the Court describes, *see* Majority Opinion at 4–6, the State introduced four posts from Appellant's Facebook page under the name "Block FrBndz Hart" as follows:

- State's Exhibit 80: "You know I draw down you draw attention slime."

- State's Exhibit 81: "Pull-up with them straps on me like Steve Urkel!!"

- State's Exhibit 82: "[G]otta hide the blicky."

- State's Exhibit 83: "Best advice I kan give my lill niggas dont get kaught[.]"

The State failed to ask Appellant if "Block FrBndz Hart" was his account but had earlier asked Appellant, "Is there a reason why you have Block on all your social media?" Appellant responded: "It's just a name I came up with."

The Court asserts that State's Exhibits 80, 82, and 83 are lyrics by other rappers. *Id.* at 7 n.4. The Court may be right, but it errs to cite facts outside

reasonably could have concluded that the probative value of the evidence [was] high." *Id.* I agree with the court of appeals: the probative value of the evidence with respect to Appellant's friendliness, naïveté, and sophistication was high enough that the trial court could have, without difficulty, reasonably concluded that its value was not substantially outweighed by any risk of unfair prejudice. And the Court does not dispute the court of appeals' judgment with respect to this factor. *See* Majority Opinion at 14. So far, so good.

### B. Improper Basis of Decision

The court of appeals observed that, while "the [rap] evidence did have [some] potential to impress the jury 'in some irrational but nevertheless indelible way,' [citation omitted] we cannot say the trial court's balancing determination was a 'clear abuse of discretion.'" *Hart*, No. 05-19-01394 at *8 (quoting *Montgomery*, 810 S.W.2d at 390). It seems to me that the court of appeals was focused on the right things.

The logical probative force of the evidence at issue in this case was that Appellant's willingness and ability to lip-sync, post, and write (or at least learn) rap lyrics about crime made it more likely that, when he was asked to be the driver in a burglary, he was actually aware that he was agreeing to facilitate a burglary and should have anticipated the resulting capital murder. The risk of unfair prejudice posed by this evidence was that the jury might conclude that Appellant's mere familiarity with the criminal subject matter of the lyrics made it more likely that he participated in *this crime*—as a straightforward character-

---

the record in support of that assertion. *See Johnson v. State*, 624 S.W.3d 579, 585 (Tex. Crim. App. 2021) ("An appellate court cannot consider an item [of evidence] that is not a part of the record on appeal.").

conformity inference. Counterbalancing that risk, however, was: (1) defense counsel's opportunity to rebut any impermissible inference during Appellant's re-direct examination, (2) his opportunity to address the same in closing argument, and (3) his opportunity to request a limiting jury instruction—which Appellant did not do here, but could have if he had truly thought it was necessary.

The Court sees things differently. In its view, "this factor weigh[ed] heavily in favor of exclusion." Majority Opinion at 19. In reaching that conclusion the Court appears to largely adopt Appellant's argument that rap lyrics are so inherently inflammatory that, absent some factual nexus between the lyrics and the crime alleged, the risk of unfair prejudice will necessarily outweigh the probative value of the lyrics as evidence. *Id.* at 15–19; Appellant's Brief at 30. This approach is flawed for a number of reasons.

First, the Court's arguments suggest a fundamental misunderstanding of the reason the State sought to admit the rap evidence in this case. In response to Appellant's testimony on direct examination, the State argued, outside of the presence of the jury, that it had a right to rebut Appellant's own evidence suggesting that he was just friendly and unsophisticated. Specifically, it argued:

> Your Honor, we believe that the Defendant in his testimony opened the door to character evidence. He previously testified that he's a friendly person.
> We also believe that he opened the door to his level of sophistication. He said that he is not good with literature. Specifically, we know him to be a rapper where he does fluently form sentences and phrases and frequently writes raps. And we believe that that directly relates to his ability to understand what people are communicating to

him and form his own opinions about things.

The State did not offer the rap evidence in this case to prove Appellant was a criminal because he sang rap songs about crime. It offered that evidence only to rebut Appellant's evidence—evidence that Appellant was not compelled to offer—that he was so naïve about and unfamiliar with crime, and so cognitively and linguistically limited, that he could not have intended to participate in a burglary on the night of the murder. Put simply, the rap evidence offered by the State here is just the kind of rebuttal evidence that Rule 404(a)(2)(A) explicitly permits. TEX. R. EVID. 404(a)(2)(A) ("In a criminal case, a defendant may offer evidence of the defendant's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.").

Contrary to what the Court seems to argue, the probative value of this kind of evidence—Rule 404(a)(2)(A) rebuttal evidence—does not depend on any factual nexus between the rap lyrics and Michael Gardner's murder. *See* Majority Opinion at 15–19.[3] Whether Appellant was rapping about true events is beside the point. The point is that the lyrics tended to show that Appellant had the ability to communicate and understand sufficiently to form the intent to participate in the crime at issue.

---

[3] As Professor Imwinkelried has explained, at least as a general proposition when assessing the admissibility of extraneous offenses under Rule 404(b), "[t]he test should be logical relevance rather than similarity. The better view is that the judge should demand proof of similarity only if the proponent's theory of logical relevance assumes similarity." 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 2:13 (2023). I see no reason why the same considerations should not apply with equal force to the admissibility of rebuttal evidence under Rule 404(a)(2)(A).

The courts that have held rap lyrics inadmissible have done so when those lyrics were offered to prove "motive, opportunity, intent," etc., under Rule 404(b)(2). *See, e.g.*, *United States v. Bey*, No. CR 16-290, 2017 WL 1547006 at 1* (E.D. Pa. Apr. 28, 2017) ("The government moves to admit this music video under Rule 404(b)(2) to prove knowledge, intent, and absence of mistake[.]");[4] TEX. R. EVID. 404(b)(2). But this case is not like those cases. To illustrate, if the State had sought to admit the rap lyrics at issue during its own case-in-chief to prove that, because Appellant sang about gun violence, he intended to participate in the murder of Michael Gardner, then requiring a closer link between the actions the lyrics described and the facts of the crime would make some sense. But when, as here, the evidence is only offered during cross-examination as trait-rebuttal evidence under Rule 404(a)(2)(A), any similarity (or lack of similarity) between the rap lyrics and the facts surrounding the charged crime is irrelevant. Consequently, the fact that the trial court did not require the State to prove some factual similarity

---

[4] *See also Baker v. State*, 899 S.E.2d 139, 141 (Ga. 2024) (State introduced "a 33-second-long portion of a [rap music] video" to establish Baker's identity, motive, and opportunity with respect to malice murder charge); *United States v. Gamory*, 635 F.3d 480, 488 (11th Cir. 2011) (Government introduced rap video to prove identity and Gamory's connection to co-conspirators in federal drug and money-laundering charges); *State v. Skinner*, 95 A.3d 236, 238 (N.J. 2014) ("[T]he State maintained that the [rap] lyrics helped to demonstrate defendant's 'motive and intent' in connection with the offense because the rap lyrics addressed a street culture of violence and retribution that fit with the State's view of defendant's role in the attempted murder."); *Commonwealth. v. Gray*, 978 N.E.2d 543, 560 (Mass. 2012) ("The lyrics show no connection to the defendant that would suggest they were biographical or otherwise indicative of his own motive or intent at the time of the shooting.").

between the rap lyrics and the crime at issue does not suggest that the trial court abused its discretion.

Moreover, I reject the Court's apparent conclusion that because courts in other jurisdictions, and on different facts, have held rap music unfairly prejudicial, the trial court's decision to admit the rap evidence in this case was "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008). A Rule 403 balancing test is necessarily a case-by-case analysis. Thus, it is not enough to say that, "because any song that glorifies criminality . . . is inherently prejudicial[,]" it was an abuse of discretion to admit the songs at issue here. Majority Opinion at 18. Our rules of evidence require the exclusion of relevant evidence only if the danger of unfair prejudice *substantially* outweighs its probative value. And as Judge Keel astutely points out, this rebuttal evidence was certainly less inflammatory than the facts of the crime alleged—and so did not seriously risk luring the jury into finding Appellant guilty on an improper basis. Dissenting Opinion of Judge Keel at 2.

In summary, I remain unpersuaded that the videos and lyrics the jury saw and heard in this case were so inherently inflammatory that they threatened to "'to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.'" *Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)). I have greater faith in our juries, and I am convinced that the court of appeals properly concluded that the trial court acted within its discretion to leave it to the jury to "evaluate the evidence's probative force." *Hart*, No. 05-19-01394 at *8.

**C. Time Needed to Develop the Evidence**

The third *Montgomery* factor, as the Court correctly notes, "looks to the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense." *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005); *see Montgomery*, 810 S.W.2d at 390; Majority Opinion at 14. But as the Court in *Mechler* pointed out, when the evidence under consideration "relate[s] directly to the charged offense, a jury [will] not be distracted away from the charged offense regardless of the required time to present" the evidence. 153 S.W.3d at 441.

The rebuttal evidence presented by the State, here, consisted of two videos, each less than five minutes long (and of the second video— "Off Days"—the record indicates that the State presented only Appellant's own, approximately 45-second, solo), and four one-sentence Facebook posts. By the Court's own calculation, of the fifteen pages of the record that make up Appellant's cross-examination, less than half of them are devoted to the rap evidence. Majority Opinion at 15. And of the forty-five pages of testimony by Appellant, less than a third of those pages are devoted to the rap evidence. *Id.* Even on its own terms, then, I cannot agree with the Court that the rap evidence consumed "an inordinate amount" of trial-time. *Id.*

Moreover, it is far from clear to me that the number of pages of Appellant's testimony spent on the rap evidence is the appropriate denominator. *See id.* In fact, it is probably not. The Court should instead focus on the entire trial, at least that part of the trial involving the presentation of evidence relating to the question of Appellant's guilt. By

my count, the presentation of the evidence relating to guilt consumed three volumes of the reporter's record, and those volumes contained roughly 265 pages of testimony. Of those 265 pages, only nineteen, according to the Court, were devoted to the rap evidence. *See id.* As the court of appeals observed, the State devoted much more time to establishing the facts of the murder and investigation, "including the video of the premises on the night of the offense, police officers' testimony of the crime scene, the search for the car used in the offense, the medical examiner's testimony, and appellant's recorded interview with police." *Hart*, No. 05-19-01394 at *9.

And even more critically, this factor did not weigh in favor of excluding the rap evidence, regardless of the time required to develop it, because it related directly to the charged offense. *See Mechler*, 153 S.W.3d at 441. Appellant's primary defensive theory at trial was his contention that his naïveté and difficulties with language prevented him from forming the intent to participate in a burglary or from anticipating the resulting murder. If the rap evidence was probative of those issues—and even the Court admits that at least the rap videos were—then the time used by the State in presenting its rebuttal evidence was not a distraction at all; rather, it was time devoted to one of the critical issues at trial. *See* Majority Opinion at 14–15. Or, at least the trial court could reasonably have thought so. Consequently, I cannot agree with the Court that this factor weighed in favor of exclusion.

### D. State's Need for the Evidence

This Court has said that, "[w]hen the proponent has other compelling or undisputed evidence to establish the proposition or fact

that the extraneous misconduct goes to prove, the misconduct evidence will weigh far less than it otherwise might in the probative-versus-prejudicial balance." *Montgomery*, 810 S.W.2d at 390. However, as the court of appeals observed, before the State proffered the video and Facebook evidence, the jurors had only heard Appellant's own testimony from which he would have had its members infer his traits of friendliness, naïveté, and language comprehension difficulties. *Hart*, No. 05-19-01394-CR at *8. Beyond the substance of his testimony, the jury had also observed Appellant frequently ask his counsel to repeat questions and Appellant's apparent difficulty in answering—which was evidently so pronounced that, at one point, the trial judge excused the jury to inquire into Appellant's competence. *Id.*[5] Thus, the court of appeals reasonably concluded that the trial court was justified in finding the State's need for evidence "was considerable[.]" *Id.*

Here, the Court suggests five alternative pieces of evidence the State could have used to prove Appellant's mental state at the time of the offense:

- "Appellant's statement that Mondo told him they were going to 'break in' to his uncle's house[;]"

---

[5] During Appellant's direct examination, defense counsel asked Appellant, "[Y]ou understand that this trial is about what—what it looks like some people did that you gave a ride to. Do you understand that?" When Appellant responded by asking, "Can you repeat that?" the trial court excused the jury to have Appellant evaluated for competency. Appellant was evaluated by Dr. Lisa Clayton, a forensic psychiatrist, who testified outside the presence of the jury that Appellant was competent but of "below average" IQ. When the defense's direct examination of Appellant resumed, Appellant testified that he understood that he was on trial because the people he had transported had killed someone.

- "inconsistencies or 'evasiveness' in the same statement[;]"[6]

- "surveillance footage of Appellant pulling the car around the parking lot prior to letting the other individuals out of the car[;]"

- "Appellant's internet-search activity in the days following the murder[;]" and

- "the fact that Appellant subsequently visited the apartments again despite being purportedly 'scared to death' at the time of the shooting."

Majority Opinion at 19. But each of these pieces of evidence was either equally consistent with Appellant's defensive theory of the case or occurred after the crime.

First, Appellant's statement that Mondo told him they were going to break into his uncle's home was a key piece of evidence of Appellant's guilt, and one that the State used. But Appellant also testified that he had not believed that Mondo had meant what he had said. Thus, the State needed *other* evidence probative of Appellant's mental state to rebut that notion after it was injected into the trial by Appellant.

That Appellant gave inconsistent or evasive testimony about Mondo's statement does seem to support the inference that Appellant was lying when he said he did not believe Mondo meant to break into

---

[6] It is unclear, here, whether the Court's allusion to Appellant's "same statement" refers to his police interview or his trial testimony. In either case, the point remains the same—Appellant's apparent evasiveness or inconsistency in either setting could imply that he was being untruthful. But it could also imply that he cannot communicate clearly or understand what others say to him, as he claimed at trial.

anyone's home. It is equally consistent, however, with Appellant's defensive theory of the case—namely, that Appellant cannot effectively communicate or comprehend what others say to him. Thus, the State, again, needed *other* evidence to rebut that testimony. And the trial court could have reasonably concluded that the State's need for the additional evidence it proffered to prove Appellant's mental state, was, as the court of appeals put it, "considerable[.]" *Hart*, No. 05-19-01394-CR at *8.

Similarly, the surveillance footage showing that the car Appellant drove circled the parking lot of the victim's apartment complex before parking down the street was evidence of Appellant's guilt. But it was not "compelling or undisputed evidence" that Appellant knew at the time of the incident that he was participating in a crime. Appellant, after all, might have circled the lot merely at the direction of the others in his vehicle—which, again, would be equally consistent with his defensive theory that he was unwittingly lured into serving as a getaway driver and did not know what he was actually doing.

Further, Appellant's actions *after* the incident—including his internet searches and returning to the apartment complex where he encountered Mondo—do not necessarily bear on his mental state *at the time* of the incident. Appellant's internet search history proves only that he learned about the murder sometime after the fact; it does not prove that he knew he was acting as a driver for a burglary at the time of the incident. Likewise, Appellant might have returned to the apartment complex where, according to his testimony, he was approached by Mondo, for any number of reasons. Some of those reasons might imply that Appellant was aware that he was acting as a getaway driver, but

others of those reasons would be consistent with Appellant's defensive theory of the case.

Finally, Appellant testified on direct examination that he was "scared to death" on the night of the incident because of traffic speeding past his vehicle as he idled on the street—undercutting the implication that he was scared because he knew that his companions were perpetrating a crime while he waited for them.[7] For that reason, the State, once again, needed other evidence to rebut Appellant's suggestion that he could not have formed the required mental state at the relevant point in time.

The Court has failed to identify other compelling or undisputed evidence that the State could have used to rebut Appellant's evidence that he had not intended to participate in a crime with his companions.

---

[7] On direct examination Appellant had the following exchange with his defense counsel:

Q. You remember talking about how another car zipped past you?

A. Yes, sir.

Q. So was that—did that have any connection do you think, with the people that you had taken?

A. No. No, sir.

Q. Well, you remember the questioning about it on the video as far as you saying that it scared you?

A. Yes, sir.

Q. So if it wasn't connected, why would it scare you?

A. It just was like a car was so close to me—well, it was close with cars flying that same day. Yes, sir.

Consequently, I cannot agree with the Court that this factor weighs in favor of exclusion.

### E. Weighing the Factors

Considering all of these factors together, I am convinced that the court of appeals was correct in its assessment: at most, only the improper-basis factor might have weighed in favor of excluding the rap lyric and Facebook evidence at issue in this case. The trial court acted well within its appropriately broad discretion in deciding to admit the evidence when it did so. *See Montgomery*, 810 S.W.2d at 389 ("trial courts should favor admission in close cases"). And the court of appeals was correct to conclude that the trial court's decision to admit the State's rebuttal evidence was firmly within the "zone of reasonable disagreement." *Id.* at 391.

I *personally* find the Court's arguments for reaching the opposite conclusion today utterly unpersuasive. More troublingly, it seems to me that the Court has simply concluded that, because *it* would not have admitted the evidence at issue had it stood in the trial court's place, the trial court *ipso facto* abused its discretion in doing otherwise. I cannot agree that, as a purely objective matter, the "zone" within which "reasonable" minds could "disagree" is nearly so narrowly circumscribed.

### II. CONCLUSION

I would affirm the judgment of the court of appeals. The Court does otherwise without proper regard for our role as a reviewing court

and on the basis of a flawed Rule 403 analysis.[8] I dissent.

**FILED:**                                                    May 8, 2024
**PUBLISH**

---

[8] Ordinarily, the Court does not determine questions of harm in the first instance, absent a decision on harm in the court of appeals. *Holder v. State*, 639 S.W.3d 704, 707 (Tex. Crim. App. 2022). "We '[n]ormally' only do so when the error is so 'plainly harmless' that principles of judicial economy support resolving it ourselves." *Id.* (quoting *Johnston v. State*, 145 S.W.3d 215, 224 (Tex. Crim. App. 2004)). Today the Court conducts a harm analysis for the first time on discretionary review without attempting to explain why that is appropriate. It is at least not clear to me that any harm from the "error" the court finds would be "plain." *See Jordan v. State*, 593 S.W.3d 340, 353 (Tex. Crim. App. 2020) (Yeary, J., dissenting) ("[T]he question of harm seems, at least, debatable—not, as the Court would have it, so self-evident as to obviate our usual practice to remand the cause for that analysis."). I dissent on that basis as well.